***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff.
3. Universal Underwriters Group, now known as Zurich Direct Underwriters, was at all times relevant to this claim the duly qualified insurer for defendant-employer.
4. On February 16, 2006, plaintiff suffered a compensable injury by accident to his left eye.
5. On February 16, 2006, plaintiff's average weekly wage was $685.79, yielding a compensation rate of $457.22.
6. On March 20, 2006, defendants filed a Form 60 Employer's Admission of Employee's Right to Compensation to pay plaintiff for an injury to the left eye at an average weekly wage of $685.79, minus a ten percent deduction, based on plaintiff's willful failure to wear safety glasses that had been provided to him by defendant-employer. Pursuant to the Form 60, defendants paid plaintiff compensation in the amount of $4,938.00 from February 16, 2006 through May 10, 2006.
7. On May 11, 2006, Special Deputy Commissioner Layla T. Santa Rosa approved a Form 24 Application to Terminate or Suspend Payment of Compensation, allowing defendants to terminate payment of compensation effective April 17, 2006.
8. The following records were stipulated into evidence at the Deputy Commissioner's hearing: *Page 3 
 a. Form 18, Notice of Accident to Employer and Claim of Employee, Representative, or Dependent for Workers' Compensation Benefits
 b. Form 19, Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission
 c. Form 22, Statement of Days Worked and Earnings of Injured Employee
 d. Form 24, Application to Terminate or Suspend Payment of Compensation
 e. Form 33, Request That Claim Be Assigned for Hearing
 f. Form 33R, Response to Request That Claim Be Assigned for Hearing
 g. Administrative Decision Order regarding Form 24
 h. Form 25R, Evaluation for Permanent Impairment by Dr. Tepedino
 i. Form 25R by Dr. Peterson
 j. Plaintiff's Answers to Defendant's First Set of Interrogatories
 k. Plaintiff's Personnel File
 l. Medical Records of Cornerstone Eye Care, Moses Cone Hospital, Wake Forest Eye Center, and Southeastern Eye Center
 m. Case Management Reports
8. The issues before the Commission are whether plaintiff refused suitable employment; whether plaintiff met his burden of proving that he suffered any disability following March 24, 2006, or provided evidence of his alleged inability to obtain employment as a result of his injury by accident; and whether defendants are entitled to a credit for payments made to plaintiff after March 24, 2006.
 *********** *Page 4 
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 39 years old and was employed by defendant-employer.
2. On January 13, 1998, plaintiff underwent an eye examination which found the visual acuity of his left eye to be 20/30.
3. On February 16, 2006, a hose plaintiff was disconnecting came loose and hit him in the left eye while he was working in the machine shop of defendant-employer.
4. Plaintiff was taken by manager William Lee Whitley to Cornerstone Eye Center where he was treated by Dr. Michael Tepedino, an ophthalmologist. Dr. Tepedino diagnosed plaintiff with a corneal abrasion. On February 22, 2006, Dr. Tepedino noted that while plaintiff's examination was completely normal, plaintiff stated that he could only count fingers. Dr. Tepedino performed a visual field test, and testified that if the results were accurate, it would indicate plaintiff had a total loss of vision. At his deposition, Dr. Tepedino testified that plaintiff's vision on February 22, 2006 was not consistent with his injury. Because plaintiff's visual field was not consistent with his findings, Dr. Tepedino referred plaintiff to Dr. Timothy Martin of the Wake Forest University Eye Center. In his referral letter, Dr. Tepedino noted that he could find no abnormalities or injuries that explained plaintiff's poor vision in the left eye.
5. On March 17, 2006, plaintiff was seen by Dr. Neal Peterson, a second year ophthalmology resident, and Dr. Timothy Martin, a neuro-ophthalmologist and associate professor at Wake Forest University Medical Center. At that time, plaintiff reported to the doctors that he could only count fingers with his left eye; however, with only a minor correction, *Page 5 
plaintiff was able to read 20/60 using his left eye. Later in the examination, with dilation and without corrective lenses, plaintiff was able to read 20/50 with the left eye. Plaintiff was also examined to determine if he had a relative afferent pupillary defect. The technique used by the doctors in cases involving monocular injuries was to use a swinging flashlight to determine whether a relative afferent pupillary defect was present. If no relative afferent pupillary defect was noted, the doctors then used a neutral density filter to create one in each eye. If a relative afferent pupillary defect could be created with equal facility in each eye, then the doctors could be sure that there was no relative afferent pupillary defect. In plaintiff's case, no relative afferent pupillary defect was noted.
6. Because of plaintiff's history of trauma, an MRI of the brain and orbits was performed on March 20, 2006. The MRI showed no evidence of optic neuropathy, but did show a frontal venous angioma that was determined to be unrelated to plaintiff's injury by accident.
7. On March 24, 2006, plaintiff returned to Dr. Peterson and Dr. Martin for another test to see if he had a relative afferent pupillary defect. Again, it was determined that plaintiff did not have a relative afferent pupillary defect. At that time, Dr. Peterson and Dr. Martin felt that plaintiff's visual acuity was at least as good as 20/40 and that there was no evidence to support significant traumatic vision loss. Dr. Peterson released plaintiff to return to work as of March 25, 2006, with no restrictions other than to wear safety glasses while working.
8. Despite being informed by his supervisor that his physicians had released him to return to work and that a job was available for him with defendant-employer, plaintiff did not accept the position that was offered.
9. On April 17, 2006, defendants filed a Form 24, requesting that they be allowed to suspend payment of temporary total disability benefits on the grounds that plaintiff refused an *Page 6 
offer of suitable employment. Plaintiff did not respond. On May 11, 2006, Special Deputy Commissioner Layla T. Santa Rosa filed an Order allowing defendants to terminate payment of compensation effective April 17, 2006. The Full Commission finds that because plaintiff unjustifiably refused defendant-employer's offer of suitable employment, defendants properly suspended payment of compensation to plaintiff.
10. On May 10, 2006, plaintiff returned to Dr. Tepedino. On examination, plaintiff reported that the visual acuity of his left eye was 20/100 without correction; however, Dr. Tepedino noted that his examination of plaintiff's left eye was completely normal. At his deposition, Dr. Tepedino testified to a reasonable degree of medical certainty that plaintiff's visual acuity was at least 20/100 and potentially better than 20/100. He also testified that he would have expected plaintiff's vision to improve over time since his injury.
11. On July 7, 2006, plaintiff returned to Wake Forest University Eye Center, where he underwent a vision test in which he read single letters starting with the 20/20 vision line and worked his way up to the larger letters. According to Dr. Martin, while there is no way to objectively measure a person's visual acuity, starting with the smallest letters is the most accurate method of finding a patient's visual acuity. When tested in this manner, plaintiff's visual acuity of the left eye was found to be 20/30.
12. On July 10, 2006, Dr. Peterson completed a Form 25R, noting that plaintiff's vision in his left eye was 20/30.
13. Following his release to return to full-duty work by Dr. Peterson on March 25, 2006, plaintiff testified that did not seek employment right away because he was in constant pain. In October 2006, plaintiff contacted Mr. Whitley at Piedmont Auto Body about a job. *Page 7 
Plaintiff began working for Piedmont Auto Body on November 1, 2006, doing substantially the same work that he had previously performed for defendant-employer.
14. Plaintiff was terminated from Piedmont Auto Body after he failed to call in or show up for a day of work over the Memorial Day weekend in May 2007. Plaintiff testified that he was unable to perform the detailed work required in the job with Piedmont Auto Body due to his decreased vision and that his absenteeism was the result of pain associated with his injury by accident. However, Mr. Whitley testified that both the quality of plaintiff's work and his absenteeism were unaffected by his injury by accident. The Full Commission finds that plaintiff's termination was not due to his injury by accident, but was due to his misconduct. Plaintiff earned the same or greater wages in his job at Piedmont Auto Body for seven months and thus, plaintiff established that he was no longer disabled and had regained wage earning capacity.
15. Plaintiff testified that after his termination he received unemployment compensation for three months and two weeks. Plaintiff testified that he has tried to find work, but that due to his injury, he is not able to do the same work in the way that he used to be able to perform it. He also testified that if he explains to a potential employer that he had an eye injury and that he cannot work the way he used to, an employer would not offer him employment. Specifically, plaintiff testified that he looked for work with four or five employers, but he did not remember the names of all the employers.
16. On November 7, 2006, plaintiff was in a motor vehicle accident. As a result of the accident, plaintiff was treated by Dr. Anthony Crawford, chiropractor, for headaches, back and shoulder pain, from November 7, 2006 through December 8, 2006. Plaintiff related all of his injuries to his motor vehicle accident. *Page 8 
17. On November 17, 2006, plaintiff was seen for a second opinion by Dr. John Matthews, a board certified ophthalmologist with Southeastern Eye Center. On examination, Dr. Matthews determined that plaintiff did not have a relative afferent pupillary defect. However, Dr. Matthews performed an optical coherent tomography that noted thinning of the deep layers of plaintiff's retina and evidence of photoreceptor disruption. Dr. Matthews testified that he had no opinion as to whether the eye damage was caused by plaintiff's injury because his examination was not close enough in time to the event. According to Dr. Martin, any damage to plaintiff's visual acuity resulting from the thinning would have occurred at the time of injury. Dr. Matthews also tested plaintiff's visual acuity by covering plaintiff's good eye and having him read an eye chart. Tested in that manner, plaintiff's visual acuity was 20/70. A foroptor instrument was then employed in order to find the best lens for plaintiff. The best lens was noted to be clear glass or no lens. Using the clear glass lens, plaintiff reported a visual acuity of 20/100. According to Dr. Matthews, visual acuity is determined based on the individual patient's responses and there is no independent way to tell what the actual acuity might be. Based on his examination, Dr. Matthews testified that plaintiff reported a vision of 20/100 in his left eye. Dr. Matthews did not have any way of determining what plaintiff's objective visual acuity was.
18. On May 10, 2007, plaintiff was seen by Dr. Peterson and Dr. Martin for complaints of photophobia, headaches and nose bleeds. Neither Dr. Martin nor Dr. Matthews were able to relate plaintiff's complaints of headaches or nose bleeds to his injury by accident, and Dr. Martin testified that it would be unusual for a macular injury to cause light sensitivity. On examination, Dr. Peterson and Dr. Martin noted no relative afferent pupillary defect; instead, they found that plaintiff's intraocular pressures were normal and that confrontation visual fields *Page 9 
showed some constricting of both eyes. When tested for visual acuity, Dr. Peterson and Dr. Martin were unable to correct plaintiff's vision to better than 20/100, while a Goldmann visual field resulted in an uninterruptable test of the left eye. All other testing failed to reveal any obvious reason for plaintiff's decreased vision.
19. On December 6, 2007, plaintiff was seen for a disability examination by Dr. William Porfilio. Dr. Porfilio is an ophthalmologist at Alamance Eye Center, who at the time of his deposition had been in practice in North Carolina for seven months. Dr. Porfilio performed an examination using a swinging flashlight, which he indicated was positive for a relative afferent pupillary defect in the left eye. With the exception of the finding of a relative afferent pupillary defect, Dr. Porfilio's examination was normal. He also noted that plaintiff's vision in the left eye was 20/400, both with and without correction. Dr. Porfilio believed that plaintiff developed an arterial venous malformation and recommended a CT scan of the head and orbits. At his deposition, Dr. Porfilio testified that it was more likely than not that plaintiff's injury by accident caused his current eye condition and that it was possible that plaintiff's description of his injury and the development of afferent pupillary defect two years later were consistent.
20. The CT scan of plaintiff's head and orbits was performed and was read by Dr. Martin as normal. Following the CT scan, Dr. Martin reviewed the medical report generated by Dr. Porfilio. According to Dr. Martin, there was nothing found by Dr. Porfilio in his examination of plaintiff that would support Dr. Porfilio's diagnosis of either an arterial venous malformation causing optic dysfunction or a carotid sinus fistula. Dr. Martin further stated that there was no link between a relative afferent pupillary defect and the development of an arterial venous malformation. *Page 10 
21. According to Dr. Martin, if Dr. Porfilio had found a relative afferent pupillary defect when Dr. Porfilio saw plaintiff on December 6, 2007, Dr. Martin would have a hard time relating it to plaintiff's injury by accident. Dr. Martin stated that it would not explain the loss of visual acuity that was reported by plaintiff to Dr. Matthews in 2006 or himself in 2007 since the development of the relative afferent pupillary defect due to trauma would have occurred simultaneously with the decrease in vision at the moment of injury.
22. Based on the optical coherence tomography testing, Dr. Martin testified that it was reasonable to find that plaintiff had developed a mild degree of maculopathy as a result of his injury by accident. According to Dr. Martin, the damage to plaintiff's visual acuity would have occurred at the time of the trauma. He had no organic explanation for a severe loss of visual field or acuity. At his November 27, 2007 deposition, Dr. Martin stated that his best "guestimate" was that plaintiff's visual acuity was in the range of 20/40, or maybe 20/50. At his April 22, 2008 deposition, Dr. Martin testified that for plaintiff, he did not have any organic explanation for visual acuity reduced much below 20/70.
23. The Commission gives greater weight to the testimony of Dr. Martin than to Dr. Porfilio regarding plaintiff's visual acuity and finds that plaintiff's visual acuity was 20/70, which equates to a 36.0% vision loss, pursuant to the Industrial Commission's Loss of Vision Table.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 11 
 CONCLUSIONS OF LAW
1. On February 16, 2006, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982). Disability under the Workers' Compensation Act refers to a diminished earning capacity. Peoples v. Cone Mills Corp., 316 N.C. 426,342 S.E.2d 798 (1986). Once plaintiff presents competent evidence of his inability to earn wages, the burden then shifts to defendants to show that plaintiff is capable of obtaining suitable employment, taking into account his physical and vocational limitations. Kennedy v. DukeUniversity Medical Center, 101 N.C. App. 24, 398 S.E.2d 677 (1990). A suitable job is one the employee is capable of performing, given his age, education, physical limitations, experience and vocational skills.Webb v. Power Circuit, Inc., 141 N.C. App. 507, 540 S.E.2d 790 (2000),cert. denied, 353 N.C. 398, 548 S.E.2d 159 (2001). The job offered to plaintiff by defendant-employer was suitable and plaintiff was not justified in refusing the job. Therefore, defendants were entitled to suspend plaintiff's compensation from March 25, 2006 until he returned to work for Piedmont Auto Body on November 1, 2006. N.C. Gen. Stat. § 97-32.
3. Plaintiff demonstrated his pre-injury wage earning capacity upon his return to work for Piedmont Auto Body on November 1, 2006. Plaintiff worked at Piedmont Auto Body until May 2007, when he was terminated for reasons unrelated to his injury by accident. Thus, plaintiff is not disabled from employment and his inability to obtain work thereafter was not due to his injury by accident. N.C. Gen. Stat. § 97-18.1(b). *Page 12 
4. Defendants are entitled to a credit for the overpayment of temporary total disability compensation made to plaintiff after March 25, 2006. N.C. Gen. Stat. § 97-42.
5. As a result of his injury by accident, plaintiff sustained permanent injuries to his left eye, resulting in visual acuity of 20/70, which amounts to a 36.0% loss of vision according to the Industrial Commission Loss of Vision Table. N.C. Gen. Stat. § 97-31(16).
6. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable eye injury on February 16, 2006, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for additional temporary total disability benefits is DENIED.
2. Subject to a reasonable attorney's fee approved below and a credit to defendants for the overpayment of temporary total disability after March 25, 2006, defendants shall pay plaintiff compensation for the 36.0% vision loss in his left eye at the rate of $457.22 per week for 43.2 weeks.
3. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. *Page 13 
4. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 2 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This 17th day of March, 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG CHAIR
 S/_______________ BERNADINE S. BALLANCE COMMISSIONER *Page 1